UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Burton Mollman,

      Plaintiff,

v.

Northland Pace Program; and
Northland Health Care Alliance,

      Defendants.

Case No.: _____

## COMPLAINT
## (JURY DEMAND)

Plaintiff brings this civil rights action against Defendants through counsel at Premo Frank PLLC.

## PARTIES

1. Plaintiff Burton Mollman is an adult individual residing and domiciled in Bismarck, North Dakota. Bismarck is in Burleigh County.

2. Defendants Northland Pace Program and Northland Health Care Alliance are incorporated as non-profits in North Dakota. They are part of an integrated enterprise ("Northland"). They share the same principal address, mailing address, and registered-agent address: 2223 East Rosser Avenue, Bismarck, North Dakota 58501. Defendants also share staff,

1

employees, and management, including Human Resources Director (Amanda Erickson), Medical Director (Kurt Datz), and CEO (Lynn Grimm).

3. At all relevant times, Defendants were integrated joint-employers of Plaintiff.

## JURISDICTION AND VENUE

4. This Court has personal jurisdiction over Defendants.

5. This Court has original subject-matter jurisdiction over Plaintiff's federal claim. This Court has supplemental jurisdiction over Plaintiff's state claim, because it arises out of the same case or controversy as his federal claim.

6. Venue is proper in this Court because Defendants reside here, and, separately, because a substantial part of the events giving rise to Plaintiff's claims occurred here.

## FACTS

*Background.*

7. Plaintiff Burton Mollman is a skilled, experienced, and hard-working Physician's Assistant.

8. In or around early September 2023, Mollman started working as a Physician's Assistant in the PACE program for Northland in Bismarck, North Dakota.

9. Lynn Grimm is Northland's CEO. Grimm has served as Northland's CEO or CFO for more than a decade.

10. Dr. Kurt Datz is Northland's Medical Director and Mollman's direct supervisor.

11. Northland is the only organization in North Dakota offering medical care under the federal PACE program. Under federal law, "PACE" stands for "Program of All-Inclusive Care for the Elderly."

12. Congress created PACE as an alternative to putting elderly persons in nursing homes: the goal being to care for the elderly more efficiently while also keeping them from losing their independence.

13. As reflected in federal regulation, PACE programs are intended to "enhance the quality of life and autonomy for frail, older adults," enable them to "live in the community as long as medically and socially feasible," and preserve their "family unit." 42 C.F.C. § 460.4(b).

14. According to the North Dakota Department of Health and Human Services, PACE programs "assume full financial risk for participants' care without limits on amount, duration or scope of services."[1] PACE programs thus provide both healthcare and health insurance to their participants.

15. PACE programs are obligated to provide "full-service" health care for elderly individuals.

16. That said, no matter how much care they provide, PACE programs are almost exclusively funded by capitated monthly payments from federal funds for each of their participants.

---

[1] *See* PACE Fact Sheet at https://www.hhs.nd.gov/sites/www/files/documents/fact-sheet-pace.pdf (last accessed on July 7, 2025).

17. This means that PACE programs do not generate more revenue by providing more care and billing for it. Instead, they generate more revenue by adding participants or increasing the monthly payments they receive per participant.

18. The amount of monthly payments received for a participant depends on the participant's "risk score." In this context, risk is largely a function of a participant's active medical diagnoses. The more active diagnoses, the higher the risk; the more severe the active diagnoses, the higher the risk; and the higher the risk, the higher the monthly payment per participant.

### *Mollman blows the whistle, and Northland retaliates.*

19. Over the course of Mollman's first few months at Northland, he began noticing that CEO Grimm had been unlawfully accessing patient medical records for the purpose of adding active diagnoses to patient charts.

20. Because Grimm is not a medical professional and is not responsible for patient care, she should not have been looking through patients charts, much less altering their list of active diagnoses.

21. On information and belief, Grimm improperly accessed participant charts and unlawfully augmented their diagnoses for the purpose of seeking higher monthly payments per participant from the government.

22. CEO Grimm's conduct raised serious concerns about unlawful billing, medical malpractice, patient safety, and patient privacy. Mollman raised these concerns with Northland.

23. While Director Datz acknowledged Grimm's wrongdoing, Mollman is not aware of any corrective measures taken by Director Datz or Northland in response to his efforts.

24. Indeed, when it came to putting profit above the law and patient wellbeing, CEO Grimm was not alone at Northland.

25. When a Northland Pace participant is referred out for dental work, or, say, to a specialist for medical care, the program itself is responsible for paying the resulting medical bills.

26. By January 2024, if not earlier, Director Datz had begun discouraging Northland providers from referring their participants out for certain kinds of dental work. Likewise, Datz had begun discouraging Northland providers from referring their participants out to medical specialists. By rationing specialist care, Northland would cut costs and increase its margins.

27. Yet, by discouraging referrals to specialists, Northland was squarely violating its legal obligations to:

   a. Follow the rules, laws, and standards applicable to medical care and avoiding medical malpractice in North Dakota;

   b. Make medical decisions for its participants based on their "current medical,

      physical, emotional, and social needs," and in accordance with current "clinical practice guidelines and professional standards of care …." 42 C.F.R. §460.92.

   c. Provide "care that meets the needs of each participant across all care settings, 24 hours a day, every day of the year …." 42 C.F.R. § 460.98.

   d. And, in particular, ensure that participants "have reasonable and timely access to specialists as indicated by [their] health condition and consistent with current clinical practice guidelines." 42 C.F.R. § 460.112(d)(3); *see also* 42 C.F.R. § 460.70 ("A PACE organization is responsible for making all reasonable and timely attempts to contract with medical specialists.")

28. Accordingly, in response to Datz's directive to ration care, Mollman raised additional legal and ethical concerns with Northland about patient safety, medical malpractice, and the failure to provide interdisciplinary care.

29. These concerns came to a head in March 2024 in the context of a particular Northland Pace participant ("Jane Doe").[2] Doe appeared to have—and had been diagnosed with—a serious form of dementia. She was thus prescribed certain medications and referred to a specialist for further treatment.

30. Then, in mid-March, Mollman went on vacation. When he returned to work later that month, Mollman found out that Director Datz had cancelled Doe's medications and referral.

---

[2] To preserve her anonymity, this Complaint will refer to the patient as "Jane Doe" or "Doe."

6

31. Over the next two weeks, Mollman refused to violate the standard of care he owed to Doe by working to reorder her prescriptions and referral. Likewise, Mollman continued to raise legal and ethical concerns about patient safety, medical malpractice, and interdisciplinary care in conversations with Director Datz, CEO Grimm, and others at Northland.

32. Following these conversations, on April 8, 2024, Northland fired Mollman without warning.

33. During the termination meeting, Grimm and Datz told Mollman that he was being fired for not being a "team player" and failing to "fall in line."

34. On information and belief, Northland then hired Director Datz's wife to replace Mollman.

35. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including lost income and benefits), emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and lost earning capacity.

## CAUSES OF ACTION

### Count I
*Retaliation in Violation of*
*N.D. Cent. Code § 34-01-20*

36. Plaintiff incorporates all of the foregoing allegations as if stated herein.

37. In North Dakota, employers are prohibited from retaliating against an employee because they engage in protected activity. Among other things, protected activity includes **(a)**

in good faith reporting a violation or suspected violation of federal, state, or local law, ordinance, regulation, or rule, to an employer, a governmental body, or a law enforcement official, [...], **or (c)** refusing an employer's order to perform an action that the employee believes violates local, state, or federal law, ordinance, rule, or regulation.

38. As alleged herein, Plaintiff engaged in protected activity under N.D. Cent. Code § 34-01-20.

39. As alleged herein, Defendants retaliated against Plaintiff because he engaged in protected activity under N.D. Cent. Code § 34-01-20.

40. As a result of the Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including lost income and benefits), emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and lost earning capacity.

**Count II**
*Retaliation in Violation of*
*The False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.*

41. Plaintiff incorporates all of the foregoing allegations as if stated herein.

42. The FCA prohibits people (including private corporations) from submitting false claims for payment to the federal government. To this end, the FCA also prohibits employers from retaliating against an employee because they engage in protected activity. Protective activity under the FCA means (a) "lawful acts ... in furtherance of an action under this

section," **or** (b) engaging in "other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

43. As alleged herein, Plaintiff engaged in protected activity under the FCA.

44. As alleged herein, Defendants unlawfully retaliated against Plaintiff by discharging him because he engaged in protected activity under the FCA.

45. In doing so, Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

46. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including lost income and benefits), emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and lost earning capacity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all claims in this matter.

## REQUEST FOR RELIEF

Based on this Complaint, Plaintiff hereby requests the Court to order judgment in his favor and against Defendants by:

A. Declaring Defendants' conduct to be in violation of Plaintiff's rights under state and federal law;

B. Awarding damages to Plaintiff in an amount greater than $75,000 for injuries including:

- The loss of past and future income and benefits; and
- Emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and lost earning capacity.

C. Awarding liquidated damages to Plaintiff as required or permitted by law;

D. Awarding treble damages to Plaintiff as required or permitted by law;

E. Awarding punitive damages to Plaintiff as required or permitted by law;

F. Imposing statutory damages or civil penalties on Defendants as required or permitted by law;

G. Awarding reasonable attorneys' fees, costs, and disbursements to Plaintiff as required or permitted by law;

H. Awarding pre- and post-judgment interest to Plaintiff as required or permitted by law; and

I. Granting any additional relief the Court deems equitable and just.

*[Signature on the following page.]*

Date: July 18, 2025                                  **PREMO FRANK PLLC**

                                                                   s/Matthew A. Frank

                                Matthew Alan Frank (MN# 0395362)
                                       matt@premofrank.com
                                Stephen M. Premo (MN# 0393346)
                                   stephen@premofrank.com
                                401 Minneapolis Grain Exchange
                                400 South 4th Street
                                Minneapolis, MN 55415
                                Tel: 612-445-7409

                                *Attorneys for Plaintiff*